UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

3:18MJ1447(DFM)

STATE OF CONNECTICUT                  :
                                      :
                                      :    ss: Hartford, January 20, 2016
                                      :
                                      :
COUNTY OF HARTFORD                    :

### AFFIDAVIT

I, Ryan Joseph James, a Special Agent of the Federal Bureau of Investigation, New

Haven Division, having been duly sworn, state:

## I.   INTRODUCTION

1.      I am an investigative or law enforcement officer of the United States within the

meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United

States who is empowered by law to conduct investigations of and to make arrests for offenses

enumerated in Section 2516 of Title 18 of the United Sates Code.  I have been employed as a

Special Agent with the Federal Bureau of Investigation ("FBI") since August 2009.  Prior to

joining the FBI, I was a sworn Police Officer in the City of St. Charles, Illinois.  As a Police

Officer, I served the City of St. Charles for approximately two and a half years.

2.      While being trained as a Special Agent of the FBI, I have received basic drug and

gang training at the FBI Academy located in Quantico, Virginia.  I have attended additional gang

training sponsored by the California Gang Investigators Association and the FBI focusing on

Street Gangs. I have attended additional homicide investigation training sponsored by the

International Homicide Investigators Association.  I have attended training sponsored by the FBI

focusing on the use of informants and cooperating witnesses.  I have attended training sponsored

by the FBI focusing on analyzing written and oral statements provided by witnesses and subjects.

I am a FBI Adjunct Faculty member certified to teach the subject of street gangs. I have written and executed search warrants that have resulted in the seizure of illegal drugs and evidence of drug violations. I have executed seizure warrants that have resulted in the seizure of assets acquired with drug proceeds and assets utilized to facilitate drug activities. Since my tenure in federal law enforcement began, I have participated in investigations involving the illegal distribution of controlled substances, firearms and gang related acts of violence to include homicides, shootings, robberies and home invasions. I have coordinated controlled purchases of illegal drugs and firearms utilizing confidential sources and cooperating witnesses. I have written and coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs, illegal firearms, acts of violence to include homicide. I have conducted electronic as well as physical surveillance of individuals involved in illegal drug distribution, analyzed records documenting the purchase and sale of illegal drugs, and provided testimony in Federal narcotics trials and testified in Federal and State Grand Jury proceedings. I have also interviewed admitted drug traffickers, drug users, gang members, informants and cooperating defendants, as well as local, state and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs. I have supervised the activities of informants and cooperating witnesses who have provided information and assistance in the federal prosecution of drug offenders. I served as the case agent, co-case agent and administrative agent on six Title III investigations and authored numerous Title III affidavits targeting drug traffickers and their organizations.

3.     I am currently assigned to the FBI's Northern Connecticut Violent Crimes Gang Task Force ("NCVCGTF"), an FBI sponsored Task Force consisting of officers from the

Connecticut State Police, East Hartford Police Department (EHPD), Hartford Police Department (HPD), and Connecticut Department of Correction. I am one of the case agents that have directed the investigation that is the subject of this Affidavit, in conjunction with Detectives of the Connecticut State Police, Detectives of the Hartford Police Department's Vice & Narcotics Division and Major Crimes Division, and members of the NCVCGTF. I have participated fully in this investigation and, as a result of this participation, as well as information provided by other law enforcement officers, I am thoroughly familiar with the information contained herein.

4. This Affidavit is submitted in support of search warrants for the following locations:

a. 50 Kensington Street, Hartford, Connecticut, which is more particularly described as a two-story vinyl-sided duplex, off-white in color, located on the north side of Kensington Street (hereafter **Target Premises 1**). The number "50" is affixed to the front of the structure. The driveway is on the east side of the residence and wraps around to the back of the residence;

b. 387 Barbour Street, Unit B, Hartford, Connecticut, which is more particularly described as a three-floor, six-unit apartment building with entry/exits on Garden and Barbour Streets (hereafter "**Target Premises 2**"). The number "387" is affixed at the entrance facing Garden Street. Unit B is located on the first floor of the building and is the north unit if entry is made from the Garden Street entrance. The letter "B" is affixed to the door; and

c. 73 Wells Street, First Floor, Manchester, Connecticut, which is more particularly described as a two story residence, blue in color, with the number "73" affixed to a pillar on the front porch of the residence (hereafter "**Target Premises 3**").

And seizure warrants for the following vehicles:

a. 2006 Infiniti G35 bearing Connecticut Registration: AC24218 and VIN: JNKCV51F66M608085, which is registered to Norka Sanchez, 56 Belden Street, East Hartford, CT 06108 (hereafter "**Target Vehicle 1**"); and

      b.   2006 Audi A6, bearing Connecticut Registration: 2ZXFE1 and VIN: WAUKH74F96N113625, which is registered to Anthony Shelton, 55 Elm Street, Apt 10C, Tariffville, CT 06081 (hereafter "**Target Vehicle 2**").

5.    This Affidavit is also submitted in support of arrest warrants for the following individuals:

      a.   ANTHONY SHELTON, a.k.a. "PRETTY," date of birth

      b.   GERARD BROWN, a.k.a. "GOLDIE," date of birth

      c.   DAVID GIL-GRANDE, date of birth

      d.   TREVON TERRY, a.k.a. "B.J.," date of birth        · and

      e.   NORKA SANCHEZ, date of birth

## II. <u>SUMMARY OF THE INVESTIGATION</u>

6.    Based on information received from cooperating witnesses, consensually monitored telephone calls and meetings, supervised purchases of controlled substances, physical surveillance, as well as court authorized wire and electronic interceptions over seven (7) Target Telephones (further described below), as well as other information gathered in this investigation by myself and other law enforcement officers participating in this investigation, I have learned the following:

7.    I, and other members of the NCVCGTF, have been investigating the criminal activities of DAVID GIL-GRANDE, ANTHONY SHELTON, a.k.a. "Pretty," GERARD BROWN, a.k.a. "Goldie," and TREVON TYLON TERRY, a.k.a. "B.J.," and their drug trafficking organization (DTO), since approximately August of 2015. Since initiating the investigation, I, and other members of the NCVCGTF, have developed evidence of widespread narcotics distribution occurring in the North End of Hartford involving members and associates

4

of the GIL-GRANDE, SHELTON, BROWN, TERRY DTO.  At various times during this investigation members and associates of the DTO facilitated their drug trafficking activities with the use of wireless telephones.

8.      Part of this investigation involved the interception of wire and/or electronic communications over various wireless telephones.  The specific details of those court ordered authorizations are described below.  In summary, investigators were authorized to intercept communications occurring over telephones used by BROWN, SHELTON and GIL-GRANDE. Those interceptions occurred between November 6, 2015 and the present.  Investigators are presently intercepting wire and electronic communications occurring over Target Telephone 7 which is being used by GIL-GRANDE.  The details of this authorizations are as follows:

a)    On November 5, 2015, United States District Judge Alvin W. Thompson, District of Connecticut, signed an Order authorizing the interception of wire communications, occurring over the following telephones: 1) telephone number (860) 888-0877 (hereafter "**Target Telephone 1**"), which is a wireless telephone, serviced by T-Mobile, subscribed to Savannah Williams, 278 Park Terrace, Hartford, Connecticut, assigned International Mobile Subscriber Identity (IMSI) number of 310260951855411, and was being utilized by Gerard BROWN, a.k.a "Goldie"; and 2) telephone number (203) 589-7862 (hereafter "**Target Telephone 2**"), which is a wireless telephone, serviced by Sprint, subscribed to LEEK LOOK, 500 WHALLEY AVE, NEW HAVEN, CT 06511, assigned electronic serial number (ESN) 270113183514047974, and was being utilized by BROWN.    On November 5, 2015, United States District Judge Alvin W. Thompson, District of Connecticut, signed an Order authorizing the interception of wire and electronic communications, occurring over telephone number (860) 728-9170 (hereafter "**Target Telephone 3**"), which is a wireless telephone, serviced by Sprint, subscribed to Anthony Snider, 56 Brook Street, Hartford, Connecticut, assigned IMSI number of 310120033580230, and was being utilized by BROWN.  Monitoring over the three phones started on November 6, 2015 and terminated on December 3, 2015.

b)    On December 4, 2015, United States District Judge Alvin W. Thompson, District of Connecticut, signed an Order authorizing the interception of wire and electronic communications occurring over the following telephones: 1) telephone number (774) 260-7656 (hereafter "**Target  Telephone 4**"), which is a wireless telephone, serviced by Verizon Wireless, subscribed to TracFone Wireless Inc,

with no listed address, and was being utilized by Anthony SHELTON, a.k.a "Pretty;" and 2) telephone number (860) 881-1594 (hereafter "**Target Telephone 5**"), which is a wireless telephone, serviced by AT&T Wireless, subscribed to PrePaid Customer, 17330 PRESTON RD, DALLAS, TX, and was being utilized by David GIL-GRANDE. Monitoring over **Target Telephone 4** started on December 4, 2015 and monitoring over **Target Telephone 5** started on December 7, 2015. Interception on both telephones terminated on January 2, 2015.

c)     On December 23, 2015, United States District Judge Alvin W. Thompson, District of Connecticut, signed an Order authorizing the interception of wire and electronic communications occurring over the following telephones: 1) telephone number (646) 725-9232 (hereafter "**Target Telephone 6**"), which is a wireless telephone, serviced by AT&T Wireless, subscribed to a prepaid account, 17330 Preston RD, Dallas TX 75252, and utilized by David GIL-GRANDE' and 2) telephone number (347) 392-8385 (hereafter "**Target Telephone 7**"), which is a wireless telephone, serviced by AT&T Wireless, subscribed to a prepaid account, 101 CINGULAR WAY, CEDARTOWN, GA 30125, and is utilized by David GIL-GRANDE. Monitoring of both phones started on December 23, 2015 and is scheduled to terminate on January 21, 2016.

9.     Based on the investigation to date, SHELTON, BROWN and TERRY are leaders of a cocaine and crack cocaine distribution network operating in Hartford's North End, principally in the Barbour/Cleveland/Kensington Street area.  While these individuals work together in their narcotics trafficking activities, they also have their own "territory" where they distribute cocaine and crack cocaine to other re-distributors. SHELTON conducts his narcotics distribution operation from 387 Barbour Street apartment building, including **Target Premises 2**, an apartment (Unit B) within 387 Barbour Street, which is part of the Chappelle Gardens Apartment Complex (CGAC).  BROWN conducts his narcotics distribution from his residence located at **Target Premises 1**.  TERRY conducts his narcotics distribution in the area of Cleveland and Barbour Streets. All these locations are located in close proximity to one another, within an approximate two square block area.

10.    The investigation has further revealed that GIL-GRANDE is supplying SHELTON, BROWN and TERRY, and others, with cocaine he receives from a source of supply in Puerto Rico, which is more particularly described herein.

11.    From my experience and training, I know that narcotics traffickers often use wireless telephones, and often speak to one another using coded, cryptic or slang words and phrases, in the belief that by doing so they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets. I also know that narcotics traffickers frequently use wireless telephones subscribed to other persons and pre-paid wireless telephones that require the purchaser to provide little or no identifying information to purchase, activate and utilize the phone, all of which is done in an effort to avoid detection and thwart the efforts of law enforcement. I know through training and experience that code words and phrases are frequently used by persons involved in the illicit distribution of drugs. From a review of the monitored conversations relative to this Affidavit, the participants involved in these conversations, and from information developed through this investigation and other investigations, it is my belief that code words are used in some conversations to refer to money and/or cocaine/cocaine base transactions. Based on the specific participants involved in conversations, information known about these participants, and the context of the conversations, I have made interpretations regarding the meaning of various words and phrases and the amount of cocaine base discussed therein. These interpretations will be indicated by parenthesis, brackets, or otherwise noted. Unintelligible portions of the conversations will be referenced using the abbreviation "UI." In addition, the contents of the monitored calls are not presented verbatim except where indicated by quotation marks.

### III. PROBABLE CAUSE TO SEARCH TARGET PREMISES 1 AND TO CHARGE GIL-GRANDE, SHELTON, BROWN AND TERRY WITH CONSPIRACY TO DISTRIBUTE CONTROLLED SUBSTANCES

12.      The investigation has revealed that GIL-GRANDE, BROWN, SHELTON and TERRY are members of a conspiracy which distributes cocaine and crack cocaine in the North End of Hartford.   In the early phase of the investigation, the person who was supplying SHELTON, BROWN and TERRY with cocaine was initially identified as the "Mexican." Subsequent investigation as described herein confirmed that the so-called "Mexican" was in fact GIL-GRANDE.   In a narcotics purchase conducted by a FBI confidential human source (CHS-1), and supervised by the investigators, on September 3, 2015, SHELTON is recorded talking with an associate, William BRASWELL, in the presence of CHS-1, about SHELTON's source of cocaine supply (SOS).   This conversation was recorded by CHS-1 who was equipped with an audio/video recording device and had been tasked to purchase a quantity of crack cocaine from SHELTON at **Target Premises 2**.   In this conversation, BRASWELL is complaining that SHELTON will not, among other things, share his SOS.   This recorded conversation reveals the existence of an ongoing conspiracy between and among SHELTON, the "Mexican," who is later identified as GIL-GRANDE, BROWN and TERRY.   A portion of this conversation is summarized as follows.   SHELTON: "My nigga like I said you didn't let shit develop, you ran off." BRASWELL: "How I'm gonna develop something when you not letting me eat." SHELTON: "If me and the Mexican tell you we got you…" BRASWELL: "Yeah you and the Mexican tell me you got me but you do so many things." SHELTON: "Once again I worked for a year before I got anything from this little Mexican nigga…I'm the only one getting money you heard, BJ [TERRY] don't." BRASWELL: "Listen, throw me an ounce on the street, show me something." SHELTON: "All my coke gone today, for once in my life I'm being greedy."

8

BRASWELL: "You already greedy." SHELTON: "Actually not you know why, I let BJ talk to the connect, I let GOLDIE [BROWN] talk to the connect, I bring him around you....he say I'm greedy but would I bring you to the connect?" CHS-1: "No." SHELTON: "Would I bring you to the connect?" CHS-1: "No." SHELTON: "Would I bring him to the connect?" CHS-1: "No." SHELTON: "Would I even bring the connect here?" CHS-1: "No." SHELTON: "Would I let the connect nigga give nigga my price?" BRASWELL: "No." SHELTON: "Don't talk greedy to me." Based on my training and experience, other intercepted communications in this and other related investigations, and other information obtained during this investigation, I believe that BRASWELL is complaining to SHELTON about him being "greedy" in not sharing his SOS and SHELTON responded that he was not greedy because he connected his SOS to TERRY ("BJ") and BROWN ("Goldie"). BRASWELL is also asking SHELTON to give him on credit an "ounce" of cocaine but SHELTON is out of "coke today."

13.    BROWN resides at **Target Premises 1** and regularly conducts his drug trafficking activities from this location. CHS-1 facilitated seven (7) crack cocaine purchases from BROWN at **Target Premises 1** from September of 2015 through January 13, 2016. During each of these purchases, investigators utilized CHS-1 to meet with BROWN and acquire varying amounts of crack cocaine. In each instance, the CHS-1 and/or his/her vehicle was searched for contraband or excess currency, provided with evidence funds to make the purchase, and equipped with audio/video recording and transmitting devices. The CHS-1 was observed by investigators has s/he traveled to and from **Target Premises 1**, and thereafter searched to retrieve the crack cocaine CHS-1 purchased from BROWN and to retrieve audio/video devices and any excess money. On each occasion, the narcotics purchased from BROWN by CHS-1 were tested for the presence of a controlled substance and each time there was a positive result

for the presence of cocaine. Investigators were also able to determine that based on their training and experience, the controlled substance was crack cocaine based on its color, appearance, and texture. A few examples of these controlled purchases are described below.

### The controlled purchase from BROWN and TERRY on October 1, 2015

14. One of the supervised crack cocaine purchases by CHS-1 from BROWN occurred on October 1, 2015. This purchase by CHS-1 of approximately 63 grams of crack cocaine reaffirmed BROWN as a distributor of crack cocaine, but revealed additional evidence of the existence of the conspiracy between and among BROWN, TERRY and SHELTON. CHS-1 first initiated communication with SHELTON on September 30, 2015. CHS-1, while in the presence of investigators, made a series of recorded calls with SHELTON in an attempt to purchase the crack cocaine. The transaction was not completed, however, because SHELTON never called CHS-1 to complete the deal. As the investigation proceeded, investigators would learn SHELTON's failure to return calls to CHS-1 and other customers was a common occurrence. SHELTON, it appeared, would not be bothered by returning customer calls and instead would rely on the customers to be persistent and call him when they were ready to purchase narcotics.

15. The next day, October 1, 2015, at approximately 11:00 a.m., CHS-1 coincidently saw SHELTON at the Sav-a-Lot store at 1250 Park Street in Hartford. CHS-1 asked SHELTON what happened yesterday when s/he (CHS-1) was supposed to buy a "six trey" (63 grams) of crack cocaine from SHELTON. SHELTON said he was running around and getting stuff ready. SHELTON then used CHS-1's phone to call BROWN. SHELTON connected with BROWN and told him to give CHS-1 the "six trey." SHELTON then gave the phone to CHS-1 while BROWN was still on the phone. BROWN told CHS-1 he'd be ready to see CHS-1 at 2:30 p.m. BROWN told CHS-1 to call him at Target Telephone 1. Based on my training and experience,

10

other intercepted communications in this and other related investigations, and other information obtained during this investigation, I believe that CHS-1 asked SHELTON where he was when CHS-1 called about purchasing 63 grams of crack cocaine, and SHELTON called BROWN, using CHS-1's phone to serve CHS-1, and then put BROWN on the phone with CHS-1 to complete the transaction.

16.     Later that afternoon, CHS-1 was met at a secure location by investigators and prepared to make the transaction. When CHS-1 called, however, BROWN told CHS-1 it would be a little while because he had to drop off his kids. Later that afternoon, CHS-1 was again met at a secure location by investigators. CHS-1 was provided with a recording device (audio/visual), transmitter, and $2,400 in FBI evidence funds. Investigators searched CHS-1's person and vehicle for any illegal items with negative results. CHS-1 then placed a recorded call to Target Telephone 1. CHS-1's phone was on speaker mode allowing your affiant to overhear the conversation. BROWN told CHS-1 that he was coming back from the South End. Several minutes later, BROWN called CHS-1 again. BROWN instructed CHS-1 to go to the hardware store on Main Street and buy some latex gloves. CHS-1 then left the secure location and drove to the hardware store followed by investigators.

17.     At approximately 5:19 p.m., investigators observed CHS-1 arrive at Star Hardware located at 2995 Main Street in Hartford. CHS-1 went into the store. Shortly thereafter, CHS-1 left Star Hardware, re-entered his/her vehicle and drove to **Target Premises 1**.

18.     At approximately 5:22 p.m., via transmitter, investigators overheard CHS-1 place a recorded call to Target Telephone 1 and investigators were able to hear BROWN instruct CHS-1 to park on the same side of **Target Premises 1**. At approximately 5:24 p.m., investigators observed CHS-1 park in front of **Target Premises 1**. CHS-1 remained in his/her vehicle.

11

19.     At approximately 5:32 p.m., investigators observed BROWN's Lexus pull into the driveway of **Target Premises 1**. At approximately 5:48 p.m., investigators observed a white Chevy Traverse arrive and park in the same driveway. Moments later, via transmitter, investigators overheard CHS-1 say "BJ [TERRY] pulled up and went in."

20.     At approximately 5:50 p.m., investigators observed two males leave **Target Premises 1,** one of whom got into the Chevy Traverse and drove away. Shortly thereafter, at approximately 5:52 p.m., via transmitter, investigators overheard CHS-1 receive a call from BROWN. A portion of the conversation is summarized as follows. CHS-1: "Hello." BROWN: "You UI wanna come in?" CHS-1: "Yeah I got the…yeah." BROWN: "Alright." CHS-1: "Yeah I yeah." BROWN: "Come to the back bro." CHS-1: "Alright bro." At this time, investigators saw CHS-1 exit his/her vehicle, walk to the rear of **Target Premises 1** and enter through the back door.

21.     At approximately 6:00 p.m., investigators observed the same white Chevy Traverse return to **Target Premises 1**. Investigators then observed a male, later identified by CHS-1 as TERRY, enter **Target Premises 1**. While CHS-1 was inside **Target Premises 1**, your affiant received text messages from CHS-1 that read, "GOLDIE and BJ are cooking it now." A portion of the recorded conversation is summarized as follows. CHS-1: "You still need these fam?" BROWN: "Um, hmm (affirm)." BROWN: "I broke my can opener! . . . shit wasn't screwing on." TERRY: "It broke?" CHS-1, while counting money: "I only had you know two five." BROWN: "That's what this is?" CHS-1: "No I bought the bags I ain't have other money (stutters) bags came out to twelve and some change, ten dollars and some change." BROWN: "Twenty four and some change?" CHS-1: "You can count it." BROWN: "I'm about to do it right now." CHS-1: "Oh ok." BROWN: "I just didn't want to have you sit." CHS-1: "Ok."

12

BROWN: "I was waiting for this shit all day." CHS-1: "Damn." BROWN: "Been up since eight o'clock this morning." CHS-1: "Damn." BROWN: "You know how many calls I got?" CHS-1: "I know you got a million." BROWN: "Then I come in and the fucking people be banging on the door." TERRY: "Stretching it right now." BROWN: "The way this shit come, it's hard to get out."

22.    At approximately 6:36 p.m., investigators observed CHS-1 exit **Target Premises 1** and re-enter his/her vehicle. CHS-1 then drove to a secure location followed by investigators. At the secure location, CHS-1 turned over to investigators one (1) clear plastic bag containing a white, rock like substance, which was still warm to the touch. Investigators then took custody of the recording and transmitting devices and searched CHS-1's person and vehicle for illegal items with negative results. The white, rock-like substance tested positive for the presence of cocaine and weighed approximately 57 grams. CHS-1 was debriefed by investigators and provided the following information:

23.    After picking up the latex gloves from Star Hardware, CHS-1 drove to **Target Premises 1**. A short time later, BROWN arrived driving his Lexus and a short time later TERRY showed up driving a Chevrolet Traverse. CHS-1 remained in his/her vehicle. TERRY entered **Target Premises 1** carrying a plastic bag. Moments later, TERRY came out and returned to the Chevrolet Traverse and left the area. BROWN also left the residence and walked to a Jaguar which was parked behind CHS-1. CHS-1 overheard BROWN tell the operator of the Jaguar to come inside the residence. Moments later, CHS-1 received a call from BROWN who told CHS-1 to come in through the back door.

24.    When CHS-1 entered **Target Premises 1**, s/he observed BROWN attempting to open a yellow coffee can. The can opener he was using broke. BROWN was now trying to open

the coffee can with a knife and screwdriver. The coffee can was yellow in color and was possibly marked "Goya." When BROWN finally got the can open, CHS-1 saw that it had a small amount of coffee on top, but underneath was a large amount of compressed cocaine. After the can was opened, TERRY returned. At that time, the only people inside the residence were CHS-1, TERRY, BROWN, and an unknown black male (UM) who appeared to be an associate of BROWN and TERRY because the UM attempted to open the can of cocaine. CHS-1 played video games with the UM while TERRY cooked the crack cocaine. TERRY and BROWN were talking about the source of supply and how it took so long to obtain the cocaine. CHS-1 could not hear most of the content of the conversation due to the video game volume being so loud. Once the powder cocaine was "cooked," or converted, to crack, BROWN handed CHS-1 the crack cocaine which was still warm to the touch. CHS-1 then gave BROWN the evidence funds. CHS-1 told BROWN that s/he used some of the money to purchase the latex gloves that he requested CHS-1 to buy. CHS-1 stated that BROWN and TERRY cooked the powder cocaine into crack using the microwave. As CHS-1 left the residence, TERRY was cooking more crack cocaine. BROWN was putting the latex gloves on as to assist TERRY. CHS-1 then left the residence and drove to a secure location to meet with investigators.

## Confidential Witness 2

21.     That the cocaine was delivered to BROWN at **Target Premises 1** in a coffee can became increasingly significant on November 20, 2015. On that date, investigators interviewed a cooperating witness (hereafter "CW-2"). CW-2 provided information without any promise or benefit. CW-2 was fearful for his safety and was providing information in the hope of receiving protection from law enforcement. CW-2 has a criminal history that includes felony convictions in the state of Connecticut for larceny, robbery, sale and possession of narcotics, assault 1st

degree, weapons possession and escape offenses.   Soon after meeting with investigators on November 20, CW-2 was arrested for firearm and assault charges associated with a shooting. Prior to his arrest, CW-2 provided the following information:

22.     CW-2 told investigators that he sold heroin and cocaine in the Sands Housing Complex on Main Street in Hartford. CW-2 had been getting supplied with cocaine and heroin from GIL-GRANDE. GIL-GRANDE recently arrived in Connecticut from Puerto Rico. CW-2 knew that GIL-GRANDE was supplied with cocaine from an unknown Dominican male who was also living in Puerto Rico. CW-2 knows that GIL-GRANDE is supplying kilogram quantities of cocaine and heroin to dealers in Hartford. CW-2 has seen GIL-GRANDE in possession of up to 10 kilograms of cocaine. CW-2 and GIL-GRANDE had been close associates and, in fact, GIL-GRANDE and CW-2 lived together for a period of time. CW-2 had a falling out with GIL-GRANDE over narcotics and monies owed. CW-2 believed that GIL-GRANDE and his Puerto Rican associates are looking for him to cause him/her harm. According to CW-2, GIL-GRANDE is known to possess firearms, including a Tech 9 firearm with a large capacity magazine.

23.     According to CW-2, GIL-GRANDE currently has two associates from Hartford who are the main distributors of his cocaine: "Pretty" and "Goldie." CW-2 was aware that GIL-GRANDE obtains his cocaine in the mail. The cocaine is shipped from Puerto Rico from the Source of Supply (SOS) in factory sealed coffee cans and mailed to addresses that GIL-GRANDE provides to his source.  Approximately 500 grams of cocaine are sealed in each coffee can and multiple cans are shipped together.   The addresses where the cocaine is sent are addresses associated with SHELTON. When GIL-GRANDE has to send money to his SOS, he utilizes the same method. GIL-GRANDE packs the proceeds into the coffee cans, seals them

15

with his own sealer and ships them via USPO to addresses in Puerto Rico. CW-2 is aware that GIL-GRANDE utilizes his girlfriend to ship the money back to Puerto Rico and never uses the same post office. GIL-GRANDE uses fictitious names as the "sender." GIL-GRANDE only communicates with his SOS via SMS from his Blackberry style cell phone. CW-2 was aware that SHELTON holds the monies that are owed to GIL-GRANDE from cocaine sales. When GIL-GRANDE needs the money he obtains it from SHELTON and re-seals the money in the coffee cans and mails to Puerto Rico. CW-2 knows how this operation works because before his "falling out" with GIL-GRANDE, it was CW-2's addresses that GIL-GRANDE's cocaine were sent to and CW-2 would be the one to hold on to the money that would ultimately be sent back on behalf of GIL-GRANDE to Puerto Rico to the SOS. After CW-2's falling out with GIL-GRANDE, SHELTON filled CW-2's role.

### Gil-Grande Collection of Drug Proceeds from Target Premises 1

25.     CW-2's information not only corroborated the use of sealed coffee cans to conceal and transport the cocaine, but also GIL-GRANDE's role as the Hartford distributor responsible for collecting the money and BROWN's use of **Target Premises 1** to store drug proceeds.  For example, on November 9, 2015, BROWN received a call from GIL-GRANDE. The following is a summary of this call. DAVID GIL-GRANDE (DGG): "I'm right here I'm pulling up right now." GB: "Huh?" DGG: "Open the back door?" GB: "You change your number…" DGG: "I'm pulling up right now." GB: "What you change your number?" DGG: "Yeah." GB: "I'm about to say I ain't got this number." DGG: "I know."

26.     After monitoring this call, surveillance units established positions around **Target Premises 1**. At approximately 10:35 p.m., surveillance units observed GIL-GRANDE exit the residence and enter the driver's seat of a Ford Fusion rental vehicle. Surveillance units followed

16

GIL-GRANDE as he left the area. A Hartford Police officer thereafter stopped GIL-GRANDE's car after observing GIL-GRANDE commit a motor vehicle infraction.   The purpose of the stop was to confirm his identify.

27.    After the traffic stop concluded, GIL-GRANDE called BROWN, on Target Telephone 2.   The following is summary of the call.   BROWN (GB): "Yo." GIL-GRANDE (DGG): "Yo pick that other phone, tell you something, I'm calling you right now, pick that other phone." Approximately one minute later, BROWN, on Target Telephone 3, received a call from GIL-GRANDE, who was using a different phone number.   This call is summarized as follows. GB: "Yo." DGG: "Yo I just got I just got home, yo you don't (stutters) what happened to me bro." GB: "What? DGG: (stutters) "Yo I'm take the exit..."GB: "Yeah." DGG: "Like going to, to the south end, check this check, check, check, yo, I'm so fucking lucky, take the exit when I'm when I'm crossing Franklin, (stutters) I don't what it is the street UI I pull up in the house, yo the NARCS stopped bro." GB: "You serious?" DGG: "Yeah, one black nigga one just one. I said oh my god, got this MONEY right here fuck! And he, apparently (stutters) he stopped me in front of Freddie's friend house, so Freddie came  out you know." GB: "Mmm." DGG: "And he said, 'ahh license and registration' I said, 'yo, I got my permit since two days bro but wife who had a car accident my wife you know my wife, um, she can't drive and I just came pick to pick up my step son and these a renta we don't even got the papers right here, just can give you my permit.' So he said, 'Ahh (stutters) you can't even drive this shiii, this car right now ahh and I gotta take the car and tow the car,' some shit like that. I said, 'yo I'm sorry apologize for real,' he said, 'Alright let me run the name, if you don't got no warrants you good.' He run my name, he made me step out from the car (stutters) and he said, 'Alright you're good you can go when I don't see you.'" GB: "Yeah." GB: "So he didn't search you or nothing?"DGG: "No ticket no nothing, I'm so, so

fucking ... I told Freddie, (stutters) Freddie was supposed...Freddie was in front of the car, I was about to tell him, 'Freddie come right here PICK THE MONEY and start running,' cause I you know." GB: "Yeah." DGG: (stutters) "I thought he might search the car, yo I'm lucky (stutters) that he was on the way to his house, I'm fucking lucky! And just for fucking stop sign, I ate, ate a fucking stop sign." GB: "You did?" DGG: "Yeah." GB: "Why you do that? That's why..." DGG: "No I didn't eat it but, but I didn't stop all the way." GB: "And that's why he pulled you over?" DGG: "Yeah." GB: "You gotta make a complete stop, what kinda cop was it?" DGG: "No I knew...fucking Impala, um Gold, I knew that was that was them (stutters) I'm saying I hope that's a regular car, cuz I know I didn't yo take the all the way (stutters) I didn't do the stop all the way. So yo I'm driving, and he keep on my back like for a minute, like oh shit I said oh my god, so I'm, I'm crossing Franklin towards Freddie friend house and he stopped me Boob Boob Boob (ph)." GB: "Yeah." DGG: "I said oh shit, he was a black black dude. Yo (stutters) if I see that nigga again I'll buy him food and everything (laughs)." GB: (laughs) DGG: "Yo." GB: "Wow." DGG: "Oh my god! UI (stutters) I was thinking that before I left, you said something like, what you said?" GB: "I said be careful you better drive safe." DGG: "UI drive I know..." GB: "WITH ALL THAT MONEY ON YOU." DGG: "It got Freddie nervous and everything." GB: "Oh man." DGG: "Shit. Oh man. Oh man, I'm not driving like that anymore." GB: "Hmm." DGG: "UI I'm taking my license out. Fuck that...fuck that." GB: "Mmm mmm mm." DGG: "Umm hmmm, save some money for the UI books you heard." GB: "For what?" DGG: "For the UI books?" GB: "Ok." DGG: "UI safety. GB: "UI Yeah." DGG: "I'll call you tomorrow, I just called you to tell you that (stutters) I came to the house right now." GB: "What happened?" DGG: (stutters) "I just came to the house right now, I called you to tell you that. I'm fricking it's a fricking lucky night. Shit." GB: "Yeah." DGG: "I hit the jackpot fuck." GB: "Your permit

straight, you just gotta make a complete stop man, when you driving with ALL THAT, you gotta drive..." DGG: "Yeah." GB: "Very cautious." DGG: "I know. I know." GB: "I'll see you in the morning." Based on my training and experience, other intercepted communications in this and other related investigations, and other information obtained during this investigation, I believe that GIL-GRANDE called BROWN and told him about how he was stopped by the police and how lucky he was because he had all the money that BROWN had given him in the Ford ("my god, got this MONEY right here fuck."), that he got pulled over right by his friend Freddie's house and was thinking about having Freddie come outside and grab the money and run, and that luckily the police did not search his vehicle. Based on the context of the these sequence of calls, investigators believe that BROWN gave GIL-GRANDE a significant amount of currency that he either owed GIL-GRANDE from a previous narcotics transactions of was paying GIL-GRANDE for a future narcotics transaction.

### Controlled Purchase from BROWN on December 30, 2015 at Target Premises 1

28.    BROWN continues to reside at and use **Target Premises 1** to distribute narcotics. On December 30, 2015, CHS-1 was again tasked to purchase crack cocaine from BROWN. CHS-1 was met at a secure location by investigators and provided with a recording device (audio/visual), transmitter, and $5,340 in FBI evidence funds. Your affiant searched CHS-1's person and with negative results. CHS-1 then called BROWN. BROWN told CHS-1 to go to **Target Premises 1**. Approximately 12 minutes later, BROWN called CHS-1 back and during this recorded call CHS-1 told BROWN s/he was driving down "Tower." CHS-1 left the secure location and drove to 50 Kensington Street followed by investigators.

29.    At approximately 6:02 p.m., on the above referenced date, investigators observed CHS-1 arrive and park in front of **Target Premises 1**, exit his/her vehicle and walk to the back

of the residence.  From the transmitter, your affiant heard CHS-1 enter **Target Premises 1** and CHS-1 and BROWN talking to each other.  Approximately 36 minutes later, investigators saw CHS-1 leave **Target Premises 1** and drive to a secure location.  At the secure location, CHS-1 gave your affiant a ziplock bag containing one clear plastic bag containing chunks of a white rock like substance. Your affiant searched CHS-1 for contraband with negative results, and collected $140 in excess evidence funds from CHS-1.  The white, rock-like substance was field tested by your affiant and tested positive for the presence of cocaine.  The bag containing the white, rock-like substance weighed approximately 117 grams.  CHS-1 was debriefed and provided the information contained in the next paragraph.

30.    When CHS-1 arrived at **Target Premises 1,** s/he went to the back of the residence and knocked on the back door and identified him/herself.  Moments later, BROWN opened the door and CHS-1 entered the residence.  BROWN was already cooking powder cocaine into crack cocaine in the kitchen.  BROWN was the only person in the residence.  CHS-1 gave BROWN $5,200 in evidence funds.  BROWN counted the money twice and agreed it was $5,200. BROWN told CHS-1 he was giving him/her "four and a half ounces."  When BROWN was done cooking, he put the crack cocaine on a scale and CHS-1 thought the scale read "120."  BROWN then handed the crack cocaine to CHS-1 in a ziplock bag and a plastic bag.  CHS-1 then left **Target Premises 1** but had to return moments later because s/he forgot his/her keys.  After finding his/her keys, CHS-1 left again and drove to a secure location.

### Controlled Purchase from BROWN on January 13, 2016 at Target Premises 1

31.    To confirm that BROWN and SHELTON were continuing to distribute cocaine and crack cocaine from their respective locations, CHS-1 was again tasked with conducting a supervised narcotics purchase.  On January 13, 2016, CHS-1 attempted to purchase crack

cocaine from SHELTON.  CHS-1 was met at a secure location and equipped with recording and transmitting devices and given $1300 in evidence funds to purchase the narcotics.  CHS-1 was then followed to Chappelle Gardens Apartment Complex.  CHS-1 parked his/her car near the Garden Street entrance and attempted to gain entry to the building but the door was locked.  CHS-1 could see the door to Unit B through the door.  CHS-1 called SHELTON. SHELTON answered and told CHS-1 he was down the street and would be back shortly.  CHS-1 returned to his/her car and waited.

32.     After unsuccessful attempts to connect with SHELTON, CHS-1 began to drive to the Barbour Street parking lot when CHS-1 saw BROWN in a white Infiniti.  CHS-1 pulled alongside of BROWN.  CHS-1 asked BROWN what he was doing and BROWN held up a plastic bag full of money and said, "I'm doing this right now."  BROWN also said he was waiting on SHELTON also but could not get a hold of him.  BROWN offered to sell crack to CHS-1 if s/he could not connect with SHELTON.  CHS-1 and BROWN then parked their cars on the Barbour Street parking area and CHS-1 renewed his attempt to reach SHELTON.  When CHS-1 could not reach SHELTON, BROWN told CHS-1 he would sell him/her crack. SHELTON and BROWN then drove to **Target Premises 1** and parked in the driveway. BROWN got out of his car with nothing in his hands and entered **Target Premises 1**.  A short time later, BROWN left **Target Premises 1** and re-entered his car.  Surveillance agents did not see BROWN carrying anything in his hands.  CHS-1 then got out of his/her car and entered BROWN's car.  Inside BROWN's car, CHS-1 handed BROWN the FBI evidence funds and BROWN gave CHS-1 the suspected crack cocaine.  CHS-1 then departed the driveway of **Target Premises 1** and drove to the predetermined location.  CHS-1 turned over the recording/transmitting devices and the suspected crack cocaine.  CHS-1 was searched for

21

substance was subjected to a field test which yielded a positive reaction to the presence of cocaine.

### IV. FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE TO SEARCH TARGET PREMISES 2 AND SEIZE TARGET VEHICLE 2

#### Controlled Purchase of Narcotics from Target Premises 2 on August 28, 2015

33.     SHELTON conducts his drug trafficking activities at 387 Barbour Street. Throughout the investigation, SHELTON was regularly seen by investigators in and around 387 Barbour Street.   SHELTON's use of this location as the center of his criminal activities was established early on in the investigation.   For example, on August 28, 2015, CHS-1 was employed to conduct a controlled purchase of crack cocaine from SHELTON at 387 Barbour Street.   CHS-1 was provided a recording device (audio/visual), transmitter, and $700 in FBI evidence funds for the purchase of crack cocaine from SHELTON.   Investigators searched CHS-1's person and vehicle for any illegal items with negative results.   CHS-1 placed a call to SHELTON but it went to voicemail.   At approximately 1:44 p.m., CHS-1 departed the secure location and drove to the CGAC followed by investigators.

34.     At approximately 1:51 p.m., investigators observed CHS-1 arrive at the CGAC and park in the parking lot to 393 Barbour Street.   Investigators overheard, via transmitter, CHS-1 talking with SHELTON and other individuals.   The following is a summary of some of the conversation.   CHS-1: "I didn't know you was over here."   SHELTON: "You didn't know I was over here?"   CHS-1: "I didn't know that."   SHELTON: "**This MY PROJECT!**"   CHS-1: "I know this your area but I ain't know you was out here."   SHELTON: "I'm out here? I got this shit rocking."   CHS-1: "Yeah."   SHELTON then walked with CHS-1 to building 387 and entered unit B.   Video surveillance captured BROWN in the kitchen of the apartment near the microwave.   A

conversation between SHELTON and BROWN was captured by the recorder worn by CHS-1. A portion of that conversation is summarized as follows. SHELTON: "What are you doing? What are you doing?" BROWN: "UI shit with baking soda." SHELTON: "Take that shit out...number good?" BROWN: "Yep hundred, hundred eleven, one eleven." SHELTON: "Straight DROP too?" BROWN: "I only cooked fourteen grams UI." SHELTON: "Oh my goodness UI this shit do itself, that coke UI." CHS-1 told SHELTON s/he had to go the bank because s/he only had $700. (Investigators only provided CHS-3 with $700 instead of $1,300 in evidence funds; the controlled purchase was intended to be for an ounce of crack cocaine). Based on my training and experience, other intercepted communications in this and other related investigations, and other information obtained during this investigation, I believe that SHELTON and BROWN are talking about "cooking" or converting powder cocaine into crack cocaine and that BROWN was cooking 14 grams of powder and that the crack was high quality ("drop" is slang in Hartford for high quality crack).

36.    At approximately 2:00 p.m., investigators observed CHS-1 drive away and return to the secure location. Investigators picked up the additional $600 in evidence funds and brought it to CHS-1 at the secure location. CHS-1 then returned to the CGAC followed by investigators.

36.    At approximately 2:45 p.m., CHS-1 arrived at the CGAC. Shortly thereafter, investigators overhead CHS-1 talking with BROWN. Upon review of video surveillance, investigators observed CHS-1 talking with BROWN while CHS-1 was seated in his/her vehicle and BROWN was seated in the driver seat of a blue Lexus. A portion of this conversation is summarized as follows. BROWN: "You gave him the money already?" CHS-1: "I already gave him seven hundred; I went to go get the rest of the money." BROWN: "You ain't got no scale?" CHS-1: "No I don't." BROWN: "You gave him the money?" CHS-1: "I gave him seven

(stutters) I had to get the rest outta the ATM machine." BROWN: "What's that right there?" CHS-1: "He said eleven." BROWN: "How much you gave him?" CHS-1: "I gave him seven." BROWN: "You got his number?" CHS-1: "No I told him I'd be right back." BROWN: "478, he about to come right back, even if I gave it to you it wouldn't add up with me." CHS-1: "Oh ok 478." BROWN: "478." CHS-1: "Ahh Uhh." BROWN: "298 2206....He about to come right back . . .He did tell me to give IT to you if you would of come in the house but I don't got no clock[1] right here and my shit is different cuz my shit is UI, you and him already did something." CHS-1: "What you want for yours?" BROWN: "Twelve hundred its drop." CHS-1: "Ok I'll give you an extra buck." BROWN to another unknown male: "You got a scale upstairs?" CHS-1: (counting money) "one two three four five." BROWN: "What's this?" CHS-1: "Um, a pound." BROWN: "Alright and you gave him?" CHS-1: "I have him seven." BROWN: "Alright put my number in your phone; you don't remember me, GOLDIE." CHS-1: "Yeah." BROWN: "860 888 0877, Kim son Gerard." After the scale was given to BROWN, video surveillance shows CHS-1 exit his/her vehicle and walk to the driver's side window of BROWN's Lexus. While standing near the front window of BROWN's Lexus, BROWN asked CHS-1, "You wanna see the number?" CHS-1 said, "I trust you, you know better than that." CHS-1 saw BROWN remove a large white bag containing crack cocaine from under the driver's seat of the Lexus. BROWN broke off a piece of crack cocaine from a larger piece that was in the white bag. BROWN put it on the scale. CHS-1 gave BROWN $500 of the evidence funds and BROWN put the piece of crack cocaine in a plastic bag and handed it to CHS-1. BROWN left the area, followed by CHS-

---

[1] "Clock" is believed to be used to refer to a scale. I have heard that term used similarly in other drug investigations to mean a scale.

1. Based on my training and experience, other intercepted communications in this and other related investigations, and other information obtained during this investigation, I believe that after CHS-1 was provided with the extra money s/he needed to purchase an ounce of crack there is discussion with BROWN about the price in that SHELTON had told CHS-1 the price was $1,100 but BROWN wanted $1,200 because it was high quality ("drop"). There is further discussion about getting a scale to weighing the crack and BROWN giving CHS-1 the call number for **Target Telephone 1.**

### SHELTON's Activities at 387 Barbour Street and his Use of Target Premises 2

37.     CHS-1 has conducted five supervised purchases of narcotics from SHELTON from August 2015 through November 2015.  Four of those transactions occurred inside Unit B, which is located on the first floor of 387 Barbour Street.  The structure of 387 Barbour Street consists of three floors and a total of six apartments.  One of the supervised narcotics purchases occurred on the second floor, which investigators believe is Unit C based on the description given by CHS-1 and a review of the video recording device worn by CHS-1 during the transaction.  On January 19, 2016, your affiant knocked on the rear door to Unit C of 387 Barbour Street in an attempt to identify who lived at the apartment.  A male's voice said, "Who is it?"  When your affiant and a Detective from the Hartford Police Department responded, "Police," the male inside refused to come to the door

38.     Investigators have been unable to confirm if SHELTON stays overnight in Unit B, or just uses said apartment to "stash" his narcotics and/or proceeds and spends the night at another apartment within 387 Barbour Street.  On January 19, 2016, you affiant spoke with the property manager to the Chappelle Gardens Apartment Complex, and she advised that "Pretty" was "living" in Unit B at 387 Barbour Street even though he did not have authorization to live

there. Despite the identification of two possible "stash locations" (Units B and C) within 387 Barbour Street, intercepted communications over Target Telephone 4 have suggested that SHELTON does indeed have other "stash" locations within the apartment building which are used by SHELTON to conduct his criminal activities. For example, on December 11, 2015, a call was intercepted over the Target Cellular Device which indicated that SHELTON had another location inside 387 Barbour Street with drug related paraphernalia. At approximately 10:46 a.m., SHELTON received a call on Target Cellular Device from Dion Smith, a.k.a. "Uncle Block." Smith works for SHELTON as a "pager." A pager is typically a drug user who performs tasks for the drug dealer in exchange for drugs. During the period of interception over Target Telephone 4, SHELTON regularly communicated with SMITH about the activities at Chappelle Gardens Apartment Complex. This phone call is summarized as follows. SHELTON: "I'm coming, Uncle Block." SMITH: "No, no, listen, listen, they are coming up immediately, they are about to come up on the house, Dad said." SHELTON: "Oh, they about to come up in here?" SMITH: "Ain't nothing in there is there?" SHELTON: "Nah, there ain't nothing in here but my microwave and my, um, silver bowl in the sink." SMITH: "That's it." SHELTON: "I'll tell Dad to put all that up, right?" SMITH: "They about to board shit up, they about to board it up." SHELTON: "I'm coming through right now." SMITH: "You coming right now, let's go, let's go." SHELTON: "Just grab the microwave and the silver bowl in the sink." SMITH: "I could do that but I, I just--told prolong, Dad said he's in a rush, they just coming to do it. Just wanted you to get your shit out there." SHELTON: "Okay, okay, okay." SMITH: "Okay, cool, just come on your way, alright, yup, yup." SHELTON: "Yup." Based on my training and experience, other intercepted communications in this and other related investigations, and other information obtained during this investigation, I believe that SHELTON instructed Smith to

26

remove some items from an apartment inside 387 Barbour Street as the property owners were coming to board up the apartment. Investigators believe this intercepted call indicates SHELTON had and continues to have multiple apartments with 387 Barbour Street that he utilizes for his illegal distribution of narcotics.

39.     Notwithstanding the uncertainty of where SHELTON is living, there is probable cause to believe, and I do believe, that Target Premises 2 contains evidence of SHELTON's criminal activity. The landlord has confirmed that SHELTON is currently residing at Target Premises 2. SHELTON has been using this location since late August 2015 and on numerous occasions stored narcotics, narcotics paraphernalia, and equipment used to convert powder to crack cocaine.

### Probable Cause to Seize Target Vehicle 2

40.     SHELTON routinely uses **Target Vehicle 2** to facilitate his narcotics activities. Investigators have seen SHELTON driving Target Vehicle 2 on numerous occasions to meet with CHS-1 and other customers to discuss narcotics related activity, and to facilitate the distribution of narcotics.   As such there is probable cause to believe, and I do believe, **Target Vehicle 2** is subject to forfeiture pursuant to Title 21, United States Code, Section 881(a)(4), as a conveyance which was used to facilitate a violation of Title 21, United States Code, Sections 841(a) and 846.

41.     For example, on October 9, 2015, CHS-1 conducted a supervised narcotics purchase of approximately 12 grams of crack cocaine for $600 from SHELTON at **Target Premises 2**. This is one the purchases generally described in this affidavit conducted by CHS-1 while supervised by investigators. On this occasion, after the exchange is completed in **Target Premises 2** investigators observed SHELTON leave with the money CHS-1 just delivered to him

and drive away in **Target Vehicle 2**.   Similarly, on November 12, 2015, in another CHS-1 supervised drug purchase, SHELTON arrived at **Target Premises 2** to complete the transaction while driving **Target Vehicle 2**.

42.     Another example where SHELTON used **Target Vehicle 2** to facilitate his narcotics activity occurred on December 13, 2015.   On this date, while investigators where monitoring Target Telephone 4, there were a series of calls between SHELTON and Robert JONES, a.k.a. "Y.O.," that indicated JONES was arranging to purchase crack cocaine from SHELTON. The following is a summary of one of the intercepted calls. SHELTON: "I could do it, let me grab this shit all." JONES: "Hmm?" SHELTON: "How you want it? Hard or Soft?" JONES: "Hard." Based on my training and experience, other intercepted communications in this and other related investigations, and other information obtained during this investigation, I believe SHELTON asked JONES if he wanted crack cocaine ("hard") or powder cocaine ("soft") and JONES responded by telling SHELTON he wanted "hard." Surveillance units subsequently observed SHELTON exit **Target Premises 2**, get into **Target Vehicle 2** and drive to the rear parking lot of One Congress Street in Hartford. Investigators saw JONES approach the front passenger side window of **Target Vehicle 2** for a brief period of time then walk away. Based on my training and experience, other intercepted communications in this and other related investigations, and other information obtained during this investigation, I believe SHELTON left **Target Premises 2** with the crack cocaine he was going to sell to JONES and drove **Target Vehicle 2** to deliver the crack cocaine to JONES.

## V. PROBABLE CAUSE TO SEARCH TARGET PREMISES 3, SEIZE TARGET VEHICLE 1 AND ADDITIONAL EVIDENCE OF THE NARCOTICS CONSPIRACY INCLUDING THE PARTICIPATION OF SANCHEZ IN THE CONSPIRACY

43.     GIL-GRANDE resides at **Target Premises 3** and has been observed coming from and going to this location on multiple occasions.  GIL-GRANDE was also intercepted on Target Telephone 7 telling his suspected source of supply that his residence was equipped with motion censored security cameras both inside and outside of the residence.  As already described in this affidavit, GIL-GRANDE was identified by CW-2 as the co-conspirator who obtains multi-kilogram quantities of cocaine from Puerto Rico and re-distributes the cocaine to SHELTON, BROWN, TERRY and others.  CW-2 also told investigators that GIL-GRANDE was responsible for collecting drug proceeds from his customers and arranging for the transport of the money to Puerto Rico.  CW-2's information about GIL-GRANDE was substantially corroborated by intercepted communications over the various target telephones, including Target Telephone 7. For example, on January 4, 2016, investigators intercepted a series of communications between GIL-GRANDE and Luis CRUZ, a.k.a. "Gordo," a customer of GIL-GRANDE.  CRUZ repeatedly complained about the poor quality of the product.  This prompted GIL-GRANDE to call his source of supply in Puerto Rico ("UM-1").  This call was lengthy and is partially summarized below.  In the call, GIL-GRANDE reported that his supply is getting low and also communicated that some customers were complaining about the quality of the cocaine. UM-1: "So tell me, what happened to you with..." DG: "Man, you don't know how much trouble it gave me, I still have 280 of that job, bastard. [UI] I gave it to two people and they tell me that they don't like it that it's bad and I gave it to another one and they also tell me that it's bad and I'm like what the hell. So I take it myself, bastard and nothing and it's in three stupid grams. They throw here, one ounce which is 28 grams and every time they throw 28 grams, you lose 2.5 or 3 grams. So you already know that when they add it all together. So what I did was to go to the neighborhood, bastard and since they sell it over there, you understand, well, that was the

29

only way I could solve that, bastard. But dude that gave such problems." UM-1: [UI] "but what job was that one? Which one?" DG: "Well I don't know, one of the first four, the first four that you sent me, one of those."

44.     GIL-GRANDE continued in the discussion that the poor quality is impacting the yield during the conversion process from powder to crack. DG: "what I am telling you but I am telling you, in my eyes, the 28 that you throw three are always missing, you understand. I am telling you, me, in my eyes because I had to do it two days straight, with people there that obviously won't-- feel the loss because I am giving it to the them cheaper but I am telling you, me, with my eyes that here was a problem with that--freaking work, man." GIL-GRANDE and the source of supply continue with a discussion about how much quantity he has left. DG: "Well I have 280 from one and ticket left still. This will be the third ticket and one I have there. I am having trouble with this one dude. You have no idea bro. For real." UM-1: "Then you have two works left still?" DG: "No I have 280 from one and one whole one that's it." The conversation then returns to quality concerns by GIL-GRANDE. UM-1: "And how was it ground up? Or how was it?" DG: "Damn like little rocks." UM-1: "But it was ground not solid." DG: "No it was UI it wasn't solid. It was when I opened it, it broke apart into a bunch of little rocks. It didn't turn into powder. It looked and smelled fine." UM-1: "Damn what work was that bro? From the stuff I sent you I have three tickets here and they were all the same. I don't understand."     I believe that based on my training and experience, and intercepted communications and other information from this investigation, they believe that GIL-GRANDE is telling his source that customers are unhappy with the quality and that in the conversion process they are losing quantity or not getting the expected yield. There is also a discussion where GIL-GRANDE reports on the amount he has left to sell "280," which I believe is a

reference to grams, and one "ticket," which I believe is in reference to one kilogram, and then a further discussion about texture of the cocaine when it was received by GIL-GRANDE [broke into a "bunch of little rocks"].

45.     Intercepted communications over BROWN's telephones, as already detailed herein, confirmed also that GIL-GRANDE picked up a large sum of money from BROWN before he was stopped by Hartford Police on November 9, 2015.  The traffic stop was orchestrated by investigators to confirm GIL-GRANDE's identification but the subsequent intercepted calls between GIL-GRANDE and BROWN confirmed that GIL-GRANDE was elated and relieved that the police did not find the money he had in his possession.  That GIL-GRANDE was arranging the transport of cocaine in sealed coffee cans was also confirmed in the October 1, 2015 crack cocaine purchase from SHELTON and BROWN by CHS-1, as more particularly described in this affidavit.  Moreover, as set forth below, multiple intercepted calls occurring over Target Telephone 7 confirm that GIL-GRANDE supplies the DTO in Hartford and collects and sends the money back to the Puerto Rico, and that **Target Premises 3** is a location used by GIL-GRANDE to store narcotics and narcotics proceeds, and records and evidence of narcotics trafficking.

46.     The investigation has revealed that SHELTON and BROWN receive and store some of the narcotics proceeds for GIL-GRANDE at **Target Premises 1** and **2** until GIL-GRANDE is ready to package the proceeds.  When GIL-GRANDE is ready for the proceeds, he picks them up from BROWN, SHELTON and other members of the DTO, then packages the proceeds at **Target Premises 3**. The proceeds are then driven to New York by GIL-GRANDE and his girlfriend, Norka SANCHEZ, and given to an unknown co-conspirator, or the proceeds are shipped directly by GIL-GRANDE to the SOS in Puerto Rico.

### Delivery of Drug Proceeds to New York by Gil-Grande and Sanchez
### on December 8-9, 2015

47.     On December 8, 2015, and into the early morning hours of December 9, investigators intercepted a serious of communications that indicated GIL-GRANDE was packaging narcotics proceeds at **Target Premises 3** and preparing to deliver them to an unknown person in New York City at the request of UM-1. UM-1 arranged to have GIL-GRANDE meet another unknown co-conspirator (hereafter "UM-2") to deliver the proceeds. I have probable cause to believe, and I do believe, that their conversations about money involve drug proceeds. We know that SHELTON and BROWN derive income from narcotics sales as investigators have supervised multiple purchases of cocaine and crack cocaine from them. We know from intercepted communications, that SHELTON and BROWN have other customers to whom they distribute narcotics. Throughout the investigation, there has been no indication that either BROWN, SHELTON on GIL-GRANDE have earned income other than through drug dealing. We know that SHELTON told BRASWELL, in CHS-1 presence, the "Mexican" supplied SHELTON, BROWN and TERRY with cocaine, and we know from CW-2 that the "Mexican" is GIL-GRANDE. We also know that GIL-GRANDE, as described below, and confirmed by CW-2, collects the drug money and arranges for its shipment to Puerto Rico. The following paragraphs summarize the intercepted communications and law enforcement surveillance.

48.     At approximately 3:37 p.m., GIL-GRANDE sent the following text message to UM-1: "I am headed to the apple in about two hours more or less." Approximately three minutes later, UM-1 called GIL-GRANDE. This call is summarized as follows. UM-1: "What you bring, bringing to the block and you didn't call me to that the money to those people." GIL-GRANDE: "I couldn't finish closing them all today because I ran out of material yesterday and

32

when I went to buy some in Walmart. . ." UM-1: "But tell me tell me because I quickly responded to my own questions, tell me you went to buy material and there wasn't a Walmart." GIL-GRANDE: "Listen I was out of duct tape, if not I would have to out the empty one...I'm missing the wrapping paper." UM-1: "If you don't have the gas tape don't do it then because I don't know why you are scared of the duct tape that you don't like putting your hand on it." GIL-GRANDE: "Listen, I'm not scared. It's that I didn't find it yesterday in the Walmart and I went to two Walmarts and I didn't find it. I have to go to another store [UI] to buy it." UM-1: "Well, listen, let me tell you this, let me tell you if over there, there Home Depots, Home Depot has it. If there are K-Marts over there, you can find it there." GIL-GRANDE: "What was I going to tell you, ah I'm here registering the car that they give me the plates and that's it. I already returned the rental car earlier. I came over here in a Taxi, I am here completing the paperwork and registering the car, so that they give me the plates and put it on the car and I will leave for New York." UM-1: "Okay then, when you are done call me." GIL-GRANDE: "Okay, because I already have everyone in line, dude, please." Based on my training and experience, other intercepted communications in this and other related investigations, and other information obtained during this investigation, I believe that UM-1 was asking GIL-GRANDE when he was coming to New York with the narcotic proceeds in the coffee containers. GIL-GRANDE told UM-1 that he couldn't "close" all of the containers because he ran out of the "material" used to seal the containers. UM-1 specifically mentions that GIL-GRANDE should use gas tape or duct tape to seal the containers and told GIL-GRANDE he should go to a Home Depot or K-Mart to get the tape. GIL-GRANDE told UM-1 that he would head to New York as soon as he is done registering his vehicle.

33

49.     At approximately 4:33 p.m., GIL-GRANDE called SHELTON. This call is summarized as follows.  SHELTON: "What up baby you are at home?" GIL-GRANDE: "Nah, I need to see you, I need to see for sure cuz today I gotta talk UI with you." SHELTON: "UI gotta talk to you." GIL-GRANDE: "Alright I'll call you soon as I'll call you when I get out from here."  Based on my training and experience, other intercepted communications in this and other related investigations, and other information obtained during this investigation, I believe GIL-GRANDE called SHELTON to meet with him to collect some of the narcotics proceeds he has to bring to New York.

50.     At approximately 5:41 p.m., GIL-GRANDE called UM-1.   This call is summarized as follows.  GIL-GRANDE: "I'm on my way home already." UM-1: "Are you still going to that person...to this people?" GIL-GRANDE: "Of course dude UI." UM-1: "Ok." GIL-GRANDE: "Yeah give heads up to the one who UI me last time, so he can start getting ready and he sees me where he saw me last time too to count the MONEY good and do all that good." UM-1: "Alright go ahead perfect . . . Later send me the photos of the car." GIL-GRANDE: "Ah alright when I get home I will send it to you." Based on my training and experience, other intercepted communications in this and other related investigations, and other information obtained during this investigation, I believe GIL-GRANDE called UM-1 to tell him he was on his way home from the DMV. UM-1 asked him if he was going to see "that person," who I believe was SHELTON, to collect the narcotics proceeds. GIL-GRANDE said, "of course" and told UM-1 to have "the one" who met GIL-GRANDE last time ready to "count the money" when he gets to New York. UM-1 told GIL-GRANDE to text ("send") him the photo of the car he'd be driving to New York so that UM-1 could let UM-2 know what car GIL-GRANDE would be driving. At approximately 7:40 p.m., UM-1 sent the following text to GIL-GRANDE: "Tell me

34

son." The cellular tower information for GIL-GRANDE's telephone indicated that he was in the vicinity of **Target Premises 3** and approximately 10 minutes later, agents observed GIL-GRANDE's rental Ford Fusion vehicle traveling on Wells Street in Manchester, Connecticut towards the high highway. Wells Street is where **Target Premises 3** is located.

51.    At approximately 9:14 p.m., GIL-GRANDE called UM-1. GIL-GRANDE: "Listen no, listen dude, that's why that you always have to dude, to clean yourself good, to clean that good where you work not leave, nothing dude. Because listen how those people work, because my buddy that is a mailman told me everything dude. He tells me that them that are mailman dude, the supervisor when they get a suspicious box, the supervisor goes to them and tells them you do your normal route, because they want to see who is the person who receives the box, because sometimes, sometimes they don't retain it and they get it out, but when they retain it is because they think is some type of bomb or something like that, that is a danger for the, the citizens, but when it is drugs they let them go through to catch the person you understand? Same as a marijuana."  Based on my training and experience, other intercepted communications in this and other related investigations, and other information obtained during this investigation, I believe GIL-GRANDE is explaining to UM-1 how he has a friend ("buddy") who works for the post office and has told GIL-GRANDE the ways that the post office detects suspicious packages.  Approximately 9:21 p.m., UM-1 called GIL-GRANDE and the following conversation was intercepted. UM-1: "How long approximately you will arrive?" GIL-GRANDE: "Well if there is no traffic going to New York, in like less than an hour I will be there, in 45 minutes." Approximately an hour and a half later, GIL-GRANDE called UM-1 and had the following conversation. GIL-GRANDE: "Did you hit him up?" UM-1: "No he left me a number here to give it to you." GIL-GRANDE: "Oh." UM-1: "Yeah I texted him, look please

35

let's do things right, let him get there and call me because he is not going with sweets and there is a UI alert over there and we cannot be fooling around, he is driving." GIL-GRANDE: "Yeah I am at ten minutes." UM-1: "Ok, let me give you the number that he gave me and you call him UI." Based on my training and experience, other intercepted communications in this and other related investigations, and other information obtained during this investigation, I believe GIL-GRANDE told UM-1 that he was 10 minutes away and GIL-GRANDE asked UM-1 if he called UM-2 to tell him he was close. UM-1 told GIL-GRANDE that UM-2 left him a number to give to GIL-GRANDE. UM-1 also told GIL-GRANDE to "do things right" and to be careful ("we cannot be fooling around.")

52.    At approximately 11:03 p.m., GIL-GRANDE called UM-2 and the following conversation was intercepted.  UM-2: "What's up buddy?" GIL-GRANDE: "Everything good papi, quiet." UM-2: "Ok tell me again to confirm." GIL-GRANDE: "1740 you already know where." UM-2: "Ahh off of 16?" GIL-GRANDE: "1740, no . . . it's the number of the building, 1740 off the, the Avenue . . . off Madison." UM-2: "Yeah ok alright." Based on my training and experience, other intercepted communications in this and other related investigations, and other information obtained during this investigation, I believe that GIL-GRANDE and UM-2 were confirming the meeting location for narcotics proceeds transfer.  GIL-GRANDE confirmed the address of 1740 Madison Avenue in New York. This is the same apartment complex where GIL-GRANDE's girlfriend, Norka SANCHEZ, once lived.

53.    At approximately 12:55 a.m. on December 9, GIL-GRANDE called UM-1 and the following conversation was intercepted. UM-1: "Look, when you are going to give something to someone of that, if they want to give you more than three thousand dollars like that of fives and that do not, tell them no... But right now he just sent me a text that you brought that

five dollars and one single bills. How much, of how much is that?" GIL-GRANDE: "A thousand dollars, that was only of five dollars." UM-1: "In total a thousand dollars:... A thousand dollars in total of fives." GIL-GRANDE: "Yeah." UM-1: "And of single bills?" GIL-GRANDE: "Of single bills some stacks that completed five dollars, ten dollars, but there wasn't a lot. Yeah, the gossiper, that I gave him the money in fives." Approximately two minutes later, GIL-GRANDE called UM-1 again and the following conversation was intercepted. GIL-GRANDE: "Ah, man. That is, that is, he told him that he was counting some money but he did not say that there was a lot of money. It was only a thousand dollars in five dollar bills. And what does he expect, dude? The people who buy here where do they go? To the bank to take loans of hundred and twenty dollar bills." UM-1: "Man, really, you don't know... Listen, me because I let it go, let it go, let it go. Earlier, I swear to God, "tell him to call me, fast." For what!? For what do you want him to call you fast, as you say, for what? If the most important thing is that he is going down, tell me. What's the hurry? To be stopped by a cop? Tell me, that's what you want? You just told me that things over there are superhot, what is your hurry for him to call? If he already said you were going to meet in a place, and when he arrives he will call. Tell me. You both know where you going, what is the hurry? Tell me, I am not losing a warrior, brother, for you guys, I told him. Don't rush, let's do things as we always do them, slow and relax, don't rush. If it cannot be done, it can be done tomorrow." GIL-GRANDE: "That money. . . the most. . . the most that a stack of a thousand dollars, of single bills, was fifty dollars. . . Sixty dollars, sorry. That is the most that it had, and it was a stack here and there. Dude, I started laughing when you say that because. . . And he--he noticed immediately, 'ah, you are already gossiping, no?'" I told him that I was counting some bills but that does not mean that... [Laughs] Oh my God!" UM-1: "No, there's no gossip but I say, how much money could there be in five dollar bills? Tell me, how much

37

money? Anyway, you have to know about this, man...You hit me up when you get home, so I can know you are home safe, I will be awake, you know I go to sleep in the day." GIL-GRANDE: "Alright alright go ahead." Based on my training and experience, other intercepted communications in this and other related investigations, and other information obtained during this investigation, I believe that GIL-GRANDE gave UM-2 some of the narcotics proceeds in small bills. UM-2 then called UM-1 to complain about this. UM-1 then called GIL-GRANDE and the two discussed exactly how much in thousands of dollars were brought to UM-2 by GIL-GRANDE in small bills. UM-1 then told GIL-GRANDE to call him when he gets home to make sure he knows GIL-GRANDE is safe.

54.     In the early morning hours of December 9, investigators stopped GIL-GRANDE's rented Ford Fusion after it returned to Connecticut from New York. Investigators identified SANCHEZ as the driver and GIL-GRANDE as the front seat passenger. This was the same Ford Fusion that agents saw near **Target Premises 3** at 7:50 p.m. on December 8.

### Seizure of Drug Proceeds from Target Vehicle 1 on January 6, 2016

55.     Beginning on January 5, and continuing until January 6, 2016, investigators intercepted a series of calls between GIL-GRANDE and SHELTON, BROWN, TERRY and UM-1 that indicated UM-1 wanted GIL-GRANDE to deliver proceeds to New York City for "three tickets." There were multiple (and sometimes lengthy) intercepted calls between the co-conspirators about the delivery of I believe was narcotics proceeds to New York. For example, on January 5, 2016, GIL-GRANDE and UM-1 discussed the planned delivery:  DGG: "Yes, All I have left is to finish completely the third one, because you know I have left . . . any how I'm almost done, bastard I don't have much left, only that headache that it's incomplete and that's it. I could bring down three tickets tomorrow for sure. From those four. Hello?"  UM-1: "How

much, how much is this?" DGG: "Three that I owed you and the 32 left for before, I can be
ready tomorrow with three tickets." UM-1: "Plus the 32?" DGG: "No, minus the 32, the 32 not
yet, I'm still ..." UM-1: "No, no, It's that I need you to bring me two and finish the 32, because it
is that they are going to make an exchange for me and I can't let it go because Thursday, I have
to go.." DGG: "Yes, you told me all of that, that is why I will have three tickets. I will bring
you two and one more ticket, three." Based on my training and experience, other intercepted
communications in this and other related investigations, and other information obtained during
this investigation, I believe that "three tickets" means three kilograms of cocaine and that GIL-
GRANDE will be delivering proceeds enough to purchase or pay off three kilograms of cocaine.

56.    In anticipation of this planned delivery, investigators established surveillance on
January 6, 2016, and witnessed GIL-GRANDE and SANCHEZ leave **Target Premises 3**,
driving **Target Vehicle 1**, and drive to **Target Premises 1** and **2**. The intercepted
communications over Target Telephone 7 further indicated GIL-GRANDE borrowed $3,000
from BROWN to complete the delivery for the "three tickets" that GIL-GRANDE planned to
deliver to New York. Further, intercepted communications on Target Telephone 7 between GIL-
GRANDE, TERRY and BROWN indicate this $3,000 was proceeds TERRY was supposed to
pay GIL-GRANDE but GIL-GRANDE could not get in contact with TERRY before he had to
leave to New York. After visiting **Target Premises 1** and **2**, surveillance units observed GIL-
GRANDE and SANCHEZ, get on I-91 south towards New York.  Your affiant arranged for a
Connecticut State Police Trooper to conduct a traffic stop on **Target Vehicle 1**. The Trooper
stopped **Target Vehicle 1** near exit 24 on I-91 south. The Trooper obtained verbal consent to
search **Target Vehicle 1** from SANCHEZ, who was the operator and registered owner of **Target
Vehicle 1**. Inside **Target Vehicle 1**, Troopers recovered approximately $92,174 of U.S.

currency, including $3000 in the front passenger door compartment, where GIL-GRANDE was seated. The State Police seized the money and gave GIL-GRANDE a receipt, while he and SANCHEZ where at State Police Troop H in Hartford. While they waited at Troop H, GIL-GRANDE called UM-1 and told him what happened. In the background of this call, SANCHEZ is talking to someone on her phone and said, "can you start getting the stuff ready." SANCHEZ then asked GIL-GRANDE for "Goldie's" (BROWN), cell phone number. UM-1 then instructed GIL-GRANDE to have SANCHEZ drive to the house (believed to be **Target Premises 3**) to "get the stuff out of his house." GIL-GRANDE told UM-1, "she already called the kid, I already told her." Your affiant believes that SANCHEZ was assisting GIL-GRANDE in making arrangements to have someone, possibly BROWN, remove narcotics or other evidence of narcotics trafficking from **Target Premises 3.**

57.     After the money seizure, UM-1 and GIL-GRANDE had further subsequent conversations which were intercepted over Target Telephone 7 during which they discuss at length what to tell police to convince them the money was legitimate. For example, after GIL-GRANDE told UM-1 that the police seized the "93,000 dollars," the following exchange was recorded: UM-1: "What damn circle of the devil, man, dude." DGG: "No but that is proof, there is proof of this. What damn shit, no. Let's see if we can  count on [UI] and recover the money. We have to find someone who has a business and can give us evidence of that money, point and case. That's the only option that we have to find." GIL-GRANDE also told UM-1 that they did not give the police his true address because he did not want them to know "where I live." GIL-GRANDE did not identify **Target Premises 3** to the police as his residence. As the conversation continued, DGG stated: "if I am going to get in trouble for this, a lawyer has to be paid because I am not going to prison for a hundred thousand dollars, huh."

40

58.     The investigation has also revealed that GIL-GRANDE keeps some of the cocaine he acquires from UM-1 at **Target Premises 3**. For example, on January 4, 2016, investigators intercepted a series of calls on Target Telephone 7 between GIL-GRANDE and an unknown male (herein "UM-3") in which investigators have probable cause to believe GIL-GRANDE brought an ounce of cocaine from **Target Premises 3** to deliver to UM-3 at Shultas Place, Hartford.

59.     At approximately 1:28 p.m., on the above date, UM-3 sent the following text message to Target Telephone 7: "Tell me I need one if you have it." At approximately 4:39 p.m., UM-3 called GIL-GRANDE and the following conversation was intercepted. UM-3: "What's up?" GIL-GRANDE: "I got a message for you, dude. I have something around. I'm around, I'll pass by and take that to you." UM-3: "Oh ok I'm waiting." GIL-GRANDE: "Ok but half or one?" UM-3: "One." GIL-GRANDE: "Alright cool." At the time of this call, the cellular tower for Target Telephone 7 was connecting to a tower near the Manchester Police Department which is 1.5 miles from **Target Premises 3**. At approximately 5:50 p.m., GIL-GRANDE called UM-3 and the following conversation was intercepted. UM-3: "Talk to me." GIL-GRANDE: "I'm out here faggot." UM-3: "Oh coming now." At this time, surveillance units observed GIL-GRANDE, driving **Target Vehicle 1,** parked near the apartment building at 120 Shultas Place in Hartford. Your affiant believes this series of intercepted calls indicates UM-3 sent a text message to GIL-GRANDE for an ounce ("one") of cocaine. GIL-GRANDE later spoke to UM-3 and confirmed he wanted "one." GIL-GRANDE then left **Target Premise 3** with the cocaine, as indicated by the cellular tower data, drove to Shultas Place and delivered the ounce of cocaine to UM-3.

60.     GIL-GRANDE and SANCHEZ used **Target Vehicle 1** to facilitate their narcotics activities in transporting narcotics and narcotics proceeds.  As such there is probable cause to believe, and I do believe, **Target Vehicle 1** is subject to forfeiture pursuant to Title 21, United States Code, Section 881(a)(4), as a conveyance which was used to facilitate a violation of Title 21, United States Code, Sections 841(a) and 846.

## VI. <u>CONCLUSION</u>

61.     During my tenure as a law enforcement officer, I have investigated and participated in numerous operations which involved, in part, drug trafficking violations, the flow of the illegal proceeds obtained from drug trafficking, and related offenses such as violations of firearms laws.  My involvement in these investigations has resulted in the successful prosecution of numerous individuals and the forfeiture of assets purchased with the proceeds from unlawful drug trafficking, as well as assets used to facilitate these violations.  Search warrants relating to these investigations have covered vehicles, residences of drug traffickers and their co-conspirators, "stash houses" used as storage and distribution points for controlled substances, safe deposit boxes, and businesses and offices used by drug dealers as fronts to legitimize their unlawful drug trafficking.

62.     Materials searched for and recovered in these locations have included various controlled substances; drug paraphernalia; books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs, records reflecting the names, addresses, and telephone numbers of co-conspirators, sales receipts and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; wireless telephones, paging devices, computers and computer disks, answering

42

machines; and various valuable assets such as real property and automobiles that were purchased with the proceeds of unlawful drug trafficking. These items obtained by search warrants, constituted evidence of drug violations, the acquisitions of assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

63.   Based on my training, experience, and participation in this and other drug trafficking investigations, I know that:

  a. drug traffickers often place assets in the names other than their own to avoid detection of these assets by law enforcement;

  b. drug traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

  c. even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

  d. drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug business;

  e. drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashier's checks, money orders, telephones with memory capabilities, telephone answering machines and telephone answering tapes, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed;

  f. drug traffickers commonly provide narcotics on consignment sale to their customers, who subsequently pay for the drugs after reselling the drugs. Therefore the above mentioned books, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

  g. drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names,

43

nicknames, addresses and telephone and beeper numbers of drug associates within their residences, for ready access and to conceal them from law enforcement agencies;

h. drug traffickers commonly maintain records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates;

i. drug traffickers who are aware of an ongoing criminal investigation will often destroy an existing format of records reflecting their drug transactions. However, it is common for drug traffickers, particularly traffickers who provide or receive drugs on a consignment basis, to create another type of drug record to assist the trafficker in the collection of drug debts;

j. drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

k. drug traffickers will commonly conceal within their residences or within the curtilage of their residences, quantities of narcotics, large amounts of currency, firearms, financial instruments, jewelry, electronic equipment and other items of value and proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money derived from drug trafficking;

l. drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

m. persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

n. drug traffickers often have photographs, slides, or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds. These photographs and video movies are normally in the drug traffickers possession or residence;

o. the State of Connecticut is generally viewed as a consumer state in regards to narcotic activity. However, it is common for drug traffickers to travel to major distribution centers such as New York to purchase their narcotics

44

for distribution. It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers. It is known that drug traffickers' methods include, but are not limited to: commercial airlines, private motor vehicles, tractor trailer units, public transportation, and motor vehicles with concealed compartments, and government and contract mail carriers. It is known that the residences of drug traffickers will often contain records of drug related travel. These records may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel;

p. based on my training and experience, drug traffickers commonly have firearms, ammunition and other weapons in their possession, in their cars, on their person, at their residence including, but not limited to handguns, rifles, shotguns, automatic weapons, knives, ammunition, and magazines. These firearms and weapons are most often kept to protect and secure drug traffickers' property;

q. based on my training, experience and participation in this and other drug trafficking investigations, I know that it is generally a common practice for drug traffickers to store their drug inventory and drug related paraphernalia in their residences, cars or those of trusted associates. This paraphernalia frequently includes scales, funnels, sifters, grinders, plastic bags, heat sealing devices, and dilutant;

r. based on my training and experience, drug dealers often create secret locations, commonly called "traps" or "hides" in their automobiles and residences. Often, drug dealers will use these traps or hides to conceal and store narcotics, weapons, money and other items and documents related to their drug trade; and

s. based on my training, experience and participation in this and other drug trafficking investigations, I know that drug traffickers often possess, maintain and control other items related to their drug trafficking activities, as described in Attachment A to this affidavit, in their cars, homes, garages and out-buildings.

64.     On the basis of the foregoing information, there is probable cause to believe that between on or about August 2015 to the present that defendants GIL-GRANDE, SHELTON, BROWN, TERRY and SANCHEZ, conspired with each other, and others, to possess with intent

45

to distribute and to distribute controlled substances, to wit, cocaine and cocaine base ("crack cocaine") in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

65.     There is also probable cause to believe that fruits, instrumentalities and evidence of these crimes will be found at:

      a.  50 Kensington Street, Hartford, Connecticut (**Target Premises 1**);

      b.  387 Barbour Street, Unit B, Hartford, Connecticut (**Target Premises 2**); and

      c.  73 Wells Street, First Floor, Manchester, Connecticut (**Target Premises 3**);

66.     Your affiant specifically requests for good cause shown that the Court authorize the search of the **Target Premises** outside of daytime hours.  More particularly, your affiant requests that the search hours for **Target Premises** be extended from 4:00 a.m. until 10:00 p.m. There is good cause to conduct the search outside of daytime hours because **Target Premises 2** is an apartment located within a multi-unit apartment building which has two entrances secured by locked doors.  SHELTON, who resides in **Target Premises 2**, uses that location as his base of operations where he regularly serves customers.  As a measure of security, SHELTON employs "pagers" who act as lookouts in and around the apartment complex.  The building where Target Premises 2 is located is a three floor structure, with approximately six (6) apartments on each floor.  To execute the search warrant, investigators will have to first pass through the locked exterior door, before getting to **Target Premises 2** which is on the first floor, which will likely take five or more minutes.  If the search is conducted during day time hours, there is a reasonable likelihood that "pagers" or customers could be in the vicinity, and be in a position to alert SHELTON of the arrival of law enforcement.  Even in a short period of time such as five or

more minutes, SHELTON could readily destroy evidence such as narcotics or narcotics paraphernalia. Additionally, on December 7, 2015, investigators intercepted a call by SHELTON where he describes a shooting he did in the apartment complex where he lives, which investigators believed occurred on or about November 27, 2015. Moreover, in September 2015, CHS-1 was inside **Target Premises 2** and observed two handguns. By allowing investigators to conduct the search between the hours of 4:00 a.m. and 6:00 a.m., there is less likelihood that the pagers or customers will be present and in a position to warn SHELTON of law enforcement's presence. Moreover, by executing the search warrant earlier, there is a reduced chance that SHELTON could access any firearms that may still be present in the location.

67.    There is also good cause to execute the search warrant for **Target Premises 1** and **3** outside of daylight hours. First, **Target Premises 2** is located in very close proximity (approximately ½ mile) to **Target Premises 1**. Because of the close relationship between SHELTON and BROWN, and the close physical proximity of their residences, investigators believe that BROWN will learn of the SHELTON search almost immediately after it's initiated. Once BROWN is alerted to the police activity, especially the involvement of federal law enforcement, at **Target Premises 2**, he will be able to remove or destroy evidence of his narcotics activity. While **Target Premises 3** is not located in close proximity to **Target Premises 1** or **2**, there is reasonable likelihood that GIL-GRANDE will be alerted to police presence at **Target Premises 1** or **2** well before the search warrant is executed at his residence. Any delay in the execution of the search warrant at **Target Premises 3** will enable GIL-GRANDE to similarly destroy or remove evidence of his narcotics activity. To avoid the potential for the removal or destruction of evidence, investigators intend to execute the search warrants simultaneously and with the Court's authorization outside of daylight hours.

68.     There is also probable cause to believe, and I do believe, that **Target Vehicles 1**

**and 2**, described herein, are subject to forfeiture pursuant to Title 21, United States Code,

Section 881(a)(4), as conveyances which were used to facilitate violations of Title 21, United

States Code, Section 846.

69.     Because this is an application that pertains to an ongoing criminal investigation,

and because disclosure of the information contained herein as well as disclosure of the warrants

and complaints being requested herein may compromise the investigation and increase the risk of

harm for the law enforcement officers responsible for conducting the arrests and searches, I

request that the warrants, applications, complaints and this affidavit be ordered sealed by the

Court, until further order of the Court.

_____
RYAN JOSEPH JAMES
Special Agent
Federal Bureau of Investigation

Subscribed and Sworn to before me
this ___ day of January, 2016.

/ / /   / /s/  DFM
_____
DONNA F. MARTINEZ
UNITED STATES MAGISTRATE JUDGE

48